UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CONTENT & COMMERCE, INC. and KEVIN DETRUDE, | ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| vs. | ) ) | No. 1:20-cv-02488-JMS-DLP |
| DONNA CHANDLER, SHOW COLORS, INC., and MY K9 BEHAVES, LLC, | ) ) ) | |
| *Defendants*. | ) ) | |
| SHOW COLORS, INC., DONNA CHANDLER, and MY K9 BEHAVES, LLC, | ) ) ) | |
| *Consol. Plaintiffs,* | ) ) | |
| vs. | ) ) | |
| CONTENT & COMMERCE, INC., KEVIN DETRUDE, and MY K9 BEHAVES, LLC, | ) ) ) | |
| *Consol. Defendants.* | ) ) | |
| SHOW COLORS, INC. and DONNA CHANDLER, | ) ) ) | |
| *Counterclaimants*, | ) ) | |
| vs. | ) ) | |
| CONTENT & COMMERCE, INC., KEVIN DETRUDE, and MY K9 BEHAVES, LLC, | ) ) ) | |
| *Counter Defendants.* | ) ) | |

1

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case serves as a reminder that in this dog-eat-dog world, independent counsel may in fact be man's best friend—and woman's best friend, too.  Donna Chandler, Kevin DeTrude, and Keneth Zweigel (through his corporation, Content & Commerce, Inc.) formed a company called My K9 Behaves, LLC ("My K9 Behaves") to develop and distribute materials related to canine behavioral training.  Their relationship has since gone to the dogs, and through their various filings, the parties have asked the Court to clean up the mess.  Presently pending before the Court is a Motion for Temporary Restraining Order and Preliminary Injunction ("Motion for Injunctive Relief") filed by Ms. Chandler and Show Colors, Inc. ("Show Colors"), a corporation owned by Ms. Chandler and her husband.  [Filing No. 51.]  The motion is now ripe for the Court's decision.

## I.
### PROCEDURAL HISTORY

On September 25, 2020, Content & Commerce, Inc. ("Content & Commerce") and Mr. DeTrude (collectively, "the C&C Parties") filed a Complaint in this Court, individually and derivatively on behalf of My K9 Behaves, against Ms. Chandler, Show Colors, and My K9 Behaves as a nominal Defendant.  [Filing No. 1.]  The C&C Parties asserted 11 claims under federal and state law.  [Filing No. 1.]

On October 19, 2020, Ms. Chandler and Show Colors (collectively, "the Chandler Parties") filed a separate lawsuit in state court, individually and derivatively on behalf of My K9 Behaves, against Mr. Zweigel, Mr. DeTrude, Content & Commerce, and My K9 Behaves.  [*See* Filing No. 1-1 in Case No. 1:20-cv-02930-JPH-DLP (S.D. Ind.).]  The state court case was removed to this Court, creating Case No. 1:20-cv-02930-JPH-DLP ("the Removed Case").  [Filing No. 1 in Case No. 1:20-cv-02930-JPH-DLP (S.D. Ind.).]  The Removed Case was consolidated with the instant case on February 10, 2021.  [Filing No. 42.]

Following consolidation, on February 25, 2021, the Chandler Parties filed their Motion for Injunctive Relief. [Filing No. 51.] In the motion, the Chandler Parties asked the Court to judicially dissolve My K9 Behaves pursuant to Indiana Code § 23-18-9-2 and to enjoin the C&C Parties and Mr. Zweigel from, among other things: utilizing Ms. Chandler's name, image, and likeness; interfering with Ms. Chandler's business relationships; using Ms. Chandler's intellectual property; and operating My K9 Behaves. [Filing No. 51.] The motion was fully briefed by the parties. [Filing No. 52; Filing No. 94; Filing No. 106.]

Thereafter, the C&C Parties, individually and derivatively on behalf of My K9 Behaves, filed an Amended Complaint against the Chandler Parties, again asserting 11 claims. [Filing No. 63.] The Chandler Parties filed an Answer, asserting nine counterclaims against the C&C Parties and a tenth counterclaim against the C&C Parties and against Mr. Zweigel individually. [Filing No. 65.] The C&C Parties and Mr. Zweigel filed a motion to dismiss the tenth counterclaim and to dismiss Mr. Zweigel from this action. [Filing No. 68.] The Court granted the motion, dismissed the tenth counterclaim with prejudice, and terminated Mr. Zweigel as a party. [Filing No. 123.]

On August 11, August 12, and September 9, 2021, the Court held an evidentiary hearing on the Chandler Parties' Motion for Injunctive Relief. [See Filing No. 143; Filing No. 144; Filing No. 153.] At the start of the hearing, pursuant to Federal Rule of Civil Procedure 65(a)(2), the Court consolidated the evidentiary hearing with a trial on the merits solely on the issue of the Chandler Parties' claim for judicial dissolution of My K9 Behaves. [See Filing No. 143 at 2.] Following the hearing, the Chandler Parties and the C&C Parties each submitted a Statement of Claims and Defenses as well as Proposed Findings of Fact and Conclusions of Law. [Filing No. 168; Filing No. 169; Filing No. 170; Filing No. 174.] Consistent with those filings and the

parties' briefs on the Motion for Injunctive Relief, the following issues will be addressed in this

Order:

> (1) Whether My K9 Behaves should be judicially dissolved pursuant to Indiana Code § 23-18-9-2, and if so, what are the terms of the dissolution; and

> (2) Whether the Chandler Parties are entitled to a preliminary injunction preventing the C&C Parties and My K9 Behaves from using Ms. Chandler's name, image, and likeness for commercial purposes.[1]

## II.
### FINDINGS OF FACT[2]

The following are the Court's factual findings from the evidence presented at the hearing

and submitted with the parties' briefs.   In making the findings that follow, the Court has

considered the testimony and the demeanor of the witnesses who testified at the evidentiary

hearing: Ms. Chandler, Greg Chandler, Mr. DeTrude, and Mr. Zweigel.

---

[1] The Court adopts this statement of the issues from the Chandler Parties' Proposed Findings of Fact and Conclusions of Law, [Filing No. 170 at 2].  In their various filings, the Chandler Parties have pointed to several actions by the C&C Parties that they would like the Court to enjoin.  [*See* Filing No. 51 at 2 (Motion for Injunctive Relief asking the Court to enjoin the C&C Parties from doing eight specific things, including operating My K9 Behaves; withdrawing funds from My K9 Behaves; contacting other people and entities and "interfering" with Ms. Chandler's business relationships with those entities; and using Ms. Chandler's name, image, likeness, business reputation, or intellectual property); Filing No. 168 at 5-6 (Chandler Parties' Statement of Claims, stating that they seek an injunction prohibiting the C&C Parties from doing a variety of things).]   However, the Court deems all other claims for injunctive relief not contained in the Proposed Findings of Fact and Conclusions of Law to be waived, and will consider only whether the Chandler Parties are entitled to the injunctive relief requested in that document.

[2] The following findings of fact are made by the Court in its capacity as factfinder for the Chandler Parties' equitable claims for judicial dissolution and injunctive relief, solely for purposes of resolving the issues addressed in this Order.  Separate legal claims remain pending, and the findings of fact contained in this Order will not and are not intended to be admissible or bind the factfinder in a later trial on the merits of the remaining legal claims, should such a trial take place.  Additionally, any finding of fact should be deemed a conclusion of law to the extent necessary, and vice versa.

### A.  Ms. Chandler's Background and Experience in Dog Training

Ms. Chandler is a canine behavioral specialist and has been training dogs since she was a teenager.  [Filing No. 147 at 29-30.]  She completed a canine behavior course through Purdue University and is accredited through the American Association of Veterinary State Boards and its Registry of Approved Continuing Education ("RACE"), a fairly exclusive accreditation. [Filing No. 147 at 28-29.]  Independent of My K9 Behaves, Ms. Chandler teaches canine training classes and trains service dogs to assist people with diabetic seizures and post-traumatic stress disorder.  [Filing No. 147 at 30; Filing No. 147 at 130.]  All parties agree that Ms. Chandler is an expert in the field of canine behavior.

Ms. Chandler has authored several works related to canine behavior and training.  In 1991, she wrote a book called *Just House Manners*.  [Filing No. 147 at 31.]  In 2003, she wrote a book called *Good Dog!*, which was also translated into a Spanish version called *Buen Perro!* [Filing No. 147 at 25; Filing No. 147 at 31.]  In 2011, she published a training manual called Principles and Techniques of Behavior Modification, which was based on her previous works. [Filing No. 147 at 32; *see also* Filing No. 147 at 18.]  Along with the manual, she created an eight-hour course that she teaches to veterinarians and veterinary technicians.  [Filing No. 147 at 27.]

Several years ago, Ms. Chandler began writing another book ("the Book").  [Filing No. 147 at 37.]  The Book is intended to be an updated and revised version of the *Good Dog!* book, which will include new chapters about wolves, how "dogs think similar to humans," how high-definition television allows dogs to "watch television and see things that they have never been able to see before," and how people can include dogs in their wills.  [Filing No. 147 at 63-64;

Filing No. 147 at 126-27.]   The Book is not yet complete.   [Filing No. 147 at 38; Filing No. 147 at 121.]

**B.  Formation and Initial Operation of My K9 Behaves**

Mr. DeTrude is the owner of a "pet resort" in Indiana.  [Filing No. 147 at 183; Filing No. 148 at 32.]  An associate of Mr. DeTrude's introduced him to Ms. Chandler, and Mr. DeTrude later introduced Ms. Chandler to Mr. Zweigel.  [Filing No. 148 at 31-32.]  The three decided to go into business together to combine Ms. Chandler's expertise as a dog trainer with Mr. DeTrude's knowledge of business development and Mr. Zweigel's experience in IT and related matters.  [Filing No. 148 at 32-35.]  In the early stages, the group came up with the idea to create a dog training video that could be widely distributed through the internet.  [Filing No. 148 at 33-35.]  Accordingly, Ms. Chandler, Mr. DeTrude, and Mr. Zweigel acting through Content & Commerce (collectively, "the Members"), decided to form My K9 Behaves.

In drafting the necessary documents to form My K9 Behaves, the Members sought assistance from attorney Jonathan Faber.  [Filing No. 147 at 22; Filing No. 147 at 241-42; Filing No. 165-1 at 10-12.]  Mr. Faber had previously done work on a project for a company with which Mr. DeTrude was associated, so Mr. DeTrude introduced Mr. Faber to the other Members and recommended him to serve as My K9 Behaves' attorney.  [Filing No. 147 at 240; Filing No. 165-1 at 10.]  None of the Members retained or consulted independent counsel to focus on individual interests.  [Filing No. 147 at 22; Filing No. 147 at 82.]  The Members met with Mr. Faber in person on one occasion in March or April of 2017 to discuss forming My K9 Behaves and other related matters.  [Filing No. 147 at 22; Filing No. 165-1 at 110-11.]  After that initial meeting, Mr. Faber communicated with the Members via email, sometimes with all three Members at once, and sometimes with one Member at a time, about forming an LLC and

registering the related intellectual property in the name of My K9 Behaves.[3]   [*See, e.g.*, Filing No. 165-1 at 16-17; Consolidated Plaintiffs' Exhibit 41; Consolidated Plaintiffs' Exhibit 43; Consolidated Plaintiffs' Exhibit 48.][4]

Mr. Faber drafted an operating agreement which, after several rounds of revisions by the Members, was ultimately signed by the Members.  [Filing No. 147 at 237.]  The final version of the agreement ("the Operating Agreement") is dated June 14, 2017, and was signed by Mr. DeTrude, Mr. Zweigel, and Ms. Chandler on July 12, 2017.  [Joint Exhibit 1; Filing No. 52-1.]  In relevant part, the Operating Agreement provides as follows:

> 1. The Members' objective for the Company is to create a method and system of canine behavioral training, along with branded products and services, which is intended to be marketed and delivered through traditional and novel ways and channels, potentially included but not limited to online delivery systems, books, apps, and through veterinary companies and partners ("Objective").
>
> ***
>
> 3.  The Members agree that Donna Chandler is an expert in the field of canine training techniques and is a published author of various works on the subject ("Copyright").  Donna Chandler represents that she has the full authority to enter into the Agreement and to participate in the Company and grant to [the] Company the permission needed to pursue the Company Objective, including creating similar or derivative works of the Copyrights.
>
> 4.  Donna Chandler is the owner of the previously registered trademark "Good Dog One-der Class" (serial number 85379390) ("Trademark").  If the Trademark is re-registered with the U.S. Patent and Trademark Office, it will be registered in the name of the Company.  Donna Chandler hereby assigns any and all existing goodwill and ownership relating to the common law and previously registered trademark interests pertaining to the Trademark and Copyrights, including the actual books and all publishing rights, to the Company.

---

[3] During her testimony, Ms. Chandler made various claims that her email account was hacked, that others were sending emails from her account, and that she never had any contact with Mr. Faber following the in-person meeting.  The Court finds that Ms. Chandler's testimony on these matters is not credible and is not consistent with the evidence, and therefore does not give it any weight.

[4]  Evidence introduced at the hearing will be referred to using the designations used in the exhibit list found at Filing No. 153-1.

5.  Because of Donna Chandler's expertise in the field relating to the Company and its Objective, and because Donna Chandler is assigning her interests to the Trademark and Copyrights, all Members agree that Donna Chandler shall be entitled to a fifty percent share of all Company profits, and Kevin DeTrude and Ken Zweigel shall each have a twenty-five percent share of all Company taxable profits ("Payout Percentages").  Similarly, in the event of any sale of the Company or compensation of any kind relating to the Company, the Members agree that financial distributions shall be according to these Payout Percentages. The Members shall determine and distribute profits annually or at more frequent intervals as determined by the Members in accordance with this Agreement.

6.  Decisions concerning operations of the Company shall be made in a collaborative, transparent manner amongst the Members at all times.  Decisions affecting the Company will be made by majority rule of the three Members, except that Donna Chandler must be one of the two Members in any majority-rule decision. . . .

7.  In the event that the Company ceases to operate at any time, Members shall each receive the remaining assets of Company according to the Payout Percentages after debts and liabilities of the Company are settled.  If Company is dissolved or ceases to operate, or if Donna Chandler ceases to be a Member of Company by decision of the Members under paragraph 6, the Trademark and Copyrights will be assigned back to Donna Chandler.  Members agree to execute any paperwork needed to effectuate and record the transfer of ownership and all goodwill of the Trademark and Copyrights from Company to Donna Chandler if or when the Company ceases to operate or if or when Donna Chandler ceases to be a Member of the Company.

8.  No Member may transfer, sell, convey, encumber, pledge, assign, or otherwise dispose of his or her interest in the Company ("Transfer") without the prior written consent of the other Members. . . .  Irrespective of the voting provisions in paragraph 6, for the first five years after the date of this Agreement, no Member may be removed from the Company unless for good cause relating to that Member's misconduct, gross negligence, or activities which are detrimental to the best interests of or operations of the Company ("Cause").  Each Member or Member's Heir, after death, departure or removal of the Member other than for Cause, shall be entitled to an ongoing, annual 10% payout of the same Company taxable profits on which the Payout Percentages are calculated ("Post-Departure Member Benefit").  The Post-Departure Member Benefit is to ensure each Member or Member's Heir a long-term interest in and benefit from the Company. At any point five years or later from the date of this Agreement, if a situation arises in which it is decided by the Members according to paragraph 6 that a Member should be removed but not for cause, then the Member being removed will be entitled to receive that Member's Payout Percentages for five years following the removal of that Member and after the fifth anniversary of that Member's removal, the remaining Members shall buy out that removed Member

based on a reasonable, neutral valuation of the removed Member's share of the Company at the time of that Member's removal which valuation also is properly adjusted for the value of the Post-Departure Member Benefit.

9.  This Agreement is not intended at this time to address every possible development, decision, eventuality or scenario that the Company may encounter. The Members agree to make decisions affecting the Company in a collaborative, transparent manner and consistent with the provisions of paragraph 6, including how to handle the possibility of a Member being incapacitated or otherwise unable or unwilling to participate in the Company in the manner contemplated by the Members, in as equitable a manner as possible.  The Members agree that . . . this Agreement can be modified, updated or replaced as needed according to the provisions of paragraph 6 and all other sections of this Agreement.  The Members agree that each Member has been selected by the other Members based on his or her respective experience, knowledge and abilities, but that this Agreement does not delineate exact responsibilities of each Member to Company.

***

11.  The Company may be dissolved upon the sale or transfer of the Company, by agreement of the Members according to paragraph 6 or by operation of law. Upon dissolution, Members will account for the Company's assets and liabilities, and assets will be liquidated according to fair market value and proceeds therefrom will be distributed according to the Payout Percentages, . . . after the Company's debts and liabilities first to third parties, and thereafter, to Members.

[Joint Exhibit 1.]  Ms. Chandler entered into the Operating Agreement freely and of her own will.  [Filing No. 147 at 13.][5]  On April 3, 2018, the Members executed an amendment to the Operating Agreement assigning Ms. Chandler's interest in My K9 Behaves to Show Colors.

[Consolidated Plaintiffs' Exhibit 9.]

---

[5] During her testimony, Ms. Chandler made several claims that the Operating Agreement jointly introduced as Exhibit 1 at the hearing was altered after she signed it, that her signature was forged, and that she never saw or agreed to certain provisions contained in the agreement.  The Court finds this testimony is not credible for several reasons, the most significant being that Ms. Chandler attached an identical copy of the Operating Agreement to her state court complaint, [*see* Filing No. 1-1 at 31-34 in Case No. 1:20-cv-02930-JPH-DLP (S.D. Ind.)], and to her Motion for Temporary Restraining Order and Preliminary Injunction, [*see* Filing No. 52-1], and she acknowledged in those filings that she was a party to the Operating Agreement and that it was binding on the parties.

Following execution of the Operating Agreement, the copyrights for the *Good Dog!* and *Buen Perro!* books were registered in the name of My K9 Behaves.  [Joint Exhibit 4; Joint Exhibit 5.]   According to Mr. Faber, Ms. Chandler participated actively in gathering the information required to register her copyrights and trademarks in the name of My K9 Behaves.  [Filing No. 165-1 at 59-60.]  Mr. Faber explained to the Members that in order to create the dog training video based on Ms. Chandler's prior work, Ms. Chandler would have to grant My K9 Behaves the necessary intellectual property rights to do so.  [*E.g.*, Consolidated Plaintiffs' Exhibit 41.]

Each of the Members made an initial contribution of $10,000 to My K9 Behaves.  [Filing No. 147 at 41.]  The $30,000 was used to create a canine training video called Good Dog! One-der Class ("the Video").  [Filing No. 147 at 41; Filing No. 147 at 100.]  The script for the Video was based on Ms. Chandler's training manual that she published in 2011.  [Filing No. 147 at 42.]  Ms. Chandler is the only person who appears in the Video, and it was shot at her farm using her dogs.  [Filing No. 147 at 53-54.]  Copyright for the Video was registered in the name of My K9 Behaves.  [Joint Exhibit 6.]

My K9 Behaves generates revenue through sales of the Video.  My K9 Behaves has a network of affiliates, including veterinarians and pet stores, that sell the Video to their customers.  [Filing No. 148 at 39.]  The profit margin for selling the Video is approximately 92%.  [Filing No. 148 at 39.]

My K9 Behaves also sells the Video to veterinarians and veterinary technicians.  Because the Video is accredited by RACE, veterinarians and veterinary technicians can purchase and watch the Video to fulfill eight hours of their continuing education requirements.  [Filing No. 148 at 43-46.]

My K9 Behaves has a website that, at all relevant times, has featured Ms. Chandler's name and photograph, along with information about her background and expertise in canine behavioral training.  [Filing No. 147 at 210-11.]  Her name and image also appear in advertising materials used to market the Video, such as My K9 Behaves' Facebook page.  [Filing No. 147 at 99-100.]

The Members are supposed to receive profit distributions in accordance with the Payout Percentages established in the Operating Agreement.  Records kept by Mr. DeTrude, however, show that on at least one occasion, distributions did not follow those percentages.  [*See* Consolidated Plaintiffs' Exhibit 23 (reflecting distributions in December 2018 in the amounts of $7,000 to Mr. DeTrude; $7,000 to Mr. Zweigel; and $4,000 to Ms. Chandler).]

### C.  Publishing Agreements Entered into by My K9 Behaves and Ms. Chandler

In July 2019, My K9 Behaves entered into a publishing agreement with Praus Press concerning publication of the Book.  [Filing No. 147 at 113-16; Consolidated Plaintiffs' Exhibit 62.]  In that agreement, Ms. Chandler represented that she was the author of an original work titled Good Dog One-der Class and that she "has assigned all ownership, right and title to Good Dog One-der Class to [My K9 Behaves], of which [Ms. Chandler] is a co-owner."  [Consolidated Plaintiffs' Exhibit 62 at 1.]  That agreement specified that Ms. Chandler was to deliver a complete manuscript to the publisher by January 1, 2020, but Ms. Chandler did not meet that deadline, and no book was ever published.  [Filing No. 147 at 62-63; Filing No. 147 at 116.]  Ms. Chandler acknowledges that, had she finished the Book, it would have been owned by My K9 Behaves.  [Filing No. 147 at 118.]

In August 2020, Ms. Chandler attempted to negotiate a separate publishing agreement, this time with Half Nelson Enterprises, for a revised version of the Book.  [Consolidated

Defendants' Exhibit 72.]  The draft of this agreement did not include My K9 Behaves as a party. [*See* Consolidated Defendants' Exhibit 72.]

### D.  Ms. Chandler's Attempt to Withdraw from My K9 Behaves

Over time, the relationship between the Members became strained.  Ms. Chandler repeatedly characterized the company atmosphere as "extremely toxic" because she was "constantly being badgered to bring in more money and to sell more" and Mr. DeTrude "was constantly screaming at [her]." [Filing No. 147 at 15-16.]  She emphasized several times that the environment was "toxic" and that she was "screamed at." [*E.g.*, Filing No. 147 at 107-10.] According to Ms. Chandler, every time the Members met or spoke on the phone, their interactions would devolve into shouting and screaming.  [Filing No. 147 at 111.]  On one occasion, while Ms. Chandler and Mr. DeTrude were travelling together on an airplane for a business trip, Mr. DeTrude yelled at Ms. Chandler to the point where she asked a flight attendant to come to her aid.  [Filing No. 147 at 59-60.]  Ms. Chandler's husband, Greg Chandler, also stated that Mr. DeTrude and Mr. Zweigel were "a nightmare to deal with." [Filing No. 147 at 178.]  Mr. Zweigel testified that "[t]here has been friction . . . since the very earliest days of the company." [Filing No. 163 at 15.]

On August 12, 2020, counsel for Ms. Chandler sent a letter to counsel for the C&C Parties titled "Notice of Withdrawl [sic] of Membership" ("the Withdrawal Letter").  [Joint Exhibit 2.]  The Withdrawal Letter indicated that Ms. Chandler was "adamantly against continuing in business with" the C&C Parties including participating in My K9 Behaves, and that the relationship between the Members was "irretrievably broken, and, given the managerial deadlock among the three Members, it [was] not reasonably practicable for the business of the Company to continue." [Joint Exhibit 2 at 1.]  Counsel further stated that the Withdrawal Letter

12

"shall serve as notice of Donna Chandler's Withdrawal of her Membership in My K9 Behaves LLC effective immediately," and demanded that the C&C Parties "Cease and Desist any further use of the name and likeness 'Donna Chandler' or derivities (sic) thereof."  [Joint Exhibit 2 at 1 (emphasis omitted).]

Ms. Chandler believed that the Withdrawal Letter constituted her withdrawal from My K9 Behaves.  [Filing No. 147 at 15.]  She is unwilling to participate in any continued operations of My K9 Behaves.  [Filing No. 147 at 21.]  Nevertheless, My K9 Behaves continued selling the Video after the Withdrawal Letter was sent.  [Filing No. 147 at 66; Filing No. 147 at 215.]  Ms. Chandler continues to receive and answer questions regarding the Video from customers who have purchased it, as she is the only Member qualified to deal with such matters.  [Filing No. 147 at 16; Filing No. 147 at 46.]  All Members continue to receive profit distributions from My K9 Behaves.  [See Filing No. 163 at 36-37.]

Mr. DeTrude and Mr. Zweigel, however, did not believe that the Withdrawal Letter had any legal effect and did not believe that Ms. Chandler had properly withdrawn from My K9 Behaves.  [Filing No. 147 at 220-21.]  Accordingly, they continued to operate My K9 Behaves and maintain all Company websites without Ms. Chandler's participation.  For example, in February 2021, Mr. DeTrude worked with a printing company to create marketing materials related to the Video, without consulting Ms. Chandler or obtaining her approval.  [Filing No. 147 at 203-05; Consolidated Plaintiffs' Exhibit 26.]  Similarly, Mr. DeTrude created a "Training Progress Report" form for customers to use to track their puppies' training development as they work through the Video, and he distributed this tool to some breeders without Ms. Chandler's approval or consent.  [Filing No. 147 at 205-09; Consolidated Plaintiffs' Exhibit 29.]

In addition, Mr. DeTrude and Mr. Zweigel continued to be in contact with My K9 Behaves' affiliates.  In early 2021, one of the affiliates terminated its relationship with My K9 Behaves, allowing no new subscribers to access the Video, as a result of unprofessional interactions with Mr. Zweigel.  [Joint Exhibit 8; Filing No. 147 at 47; Filing No. 147 at 57.]  On one occasion, Mr. Zweigel forwarded to Mr. DeTrude an email solicitation from a "learning website" seeking to post My K9 Behaves' content.  [Consolidated Plaintiffs' Exhibit 53.]  In his email, Mr. Zweigel suggested to Mr. DeTrude that they "piss off Donna even more" by offering the Video for sale on a new website.  [Consolidated Plaintiffs' Exhibit 53; Filing No. 163 at 35.] He further expressed his opinion that "a courtroom is exactly like a casino" and "the adrenaline rush and potential victory or loss in litigation is no different than that of a high-stakes poker game."  [Consolidated Plaintiffs' Exhibit 53.]  Mr. Zweigel claimed that this email was merely "meant to illicit a laugh" from Mr. DeTrude.  [Filing No. 163 at 36.]  The Court rejects this characterization as incredible and false, given that Mr. Zweigel's and Mr. DeTrude's actions demonstrate their intent to provoke Ms. Chandler and to take advantage of her emotional turmoil by continuing to operate My K9 Behaves for their own benefit in contravention of the majority rule provisions of the Operating Agreement.

## III.
### CONCLUSIONS OF LAW

### A. Validity of the Operating Agreement and the Assignment of Ms. Chandler's Intellectual Property

During her testimony at the evidentiary hearing, Ms. Chandler repeatedly asserted that the Operating Agreement was forged or altered or that she did not voluntarily sign it. Importantly, it does not appear that counsel for the Chandler Parties endorses Ms. Chandler's allegations of fraud and misconduct, as these claims have not been presented in any of the

Chandler Parties' filings, and instead the Chandler Parties rely on provisions of the Operating Agreement in support of their various arguments.  Nevertheless, the Court has considered Ms. Chandler's allegations and rejects them as implausible and inconsistent with the record evidence. The Court finds that the Operating Agreement is valid and enforceable.

Furthermore, the Court finds that the Operating Agreement constitutes a valid assignment of certain of Ms. Chandler's intellectual property rights to My K9 Behaves.  Exactly what rights were assigned, however, is less clear.  Pursuant to the Operating Agreement, Ms. Chandler "assign[ed] any and all existing goodwill and ownership relating to the common law and previously registered trademark interests pertaining to the Trademark and Copyrights, including the actual books and all publishing rights, to the Company."  [Joint Exhibit 1 at 2.]  "Trademark" is defined as "the previously registered trademark 'Good Dog One-der Class' (serial number 85379390)."  [Joint Exhibit 1 at 2.]  "Copyrights" is not expressly defined, but "Copyright" is defined, albeit not with exceptional clarity.  [*See* Joint Exhibit 1 at 1 ("The Members agree that Donna Chandler is an expert in the field of canine training techniques and is a published author of various works on the subject ('Copyright').").]  Based on this definition, the Court concludes that by signing the Operating Agreement, Ms. Chandler assigned to My K9 Behaves her ownership of the defined trademark and of the copyrights for all of her published works on the subject of canine training techniques.

It is not disputed that the Video is based on Ms. Chandler's prior works, including the *Good Dog!* book and the training manual called Principles and Techniques of Behavior Modification.  Because the copyright interests in the prior works were assigned to My K9 Behaves, and the Video is derivative of those prior works, My K9 Behaves is the owner of all copyright interests in the Video.  *See Kennedy v. Nat'l Juv. Det. Ass'n*, 187 F.3d 690, 694 (7th

15

Cir. 1999) ("The owner of a copyright of literary material is granted exclusive rights to do and authorize another to do any of the following: (1) reproduce the copyrighted work; (2) prepare derivative works based upon the copyrighted work; (3) distribute copies of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.  Any of these exclusive ownership rights may be transferred by written instrument.") (citations omitted).[6]

### B.  Effect of the Withdrawal Letter

The Operating Agreement does not contain a provision addressing a Member's ability to withdraw from My K9 Behaves.  It does, however, provide that decisions concerning the operations of the company be made by a majority rule, so long as Ms. Chandler is a  Member of the majority.  [*See* Joint Exhibit 1 at 2.]  It further requires that a Member seeking to dispose of his or her interest in the company obtain prior written consent of the other Members before doing so.  [*See* Joint Exhibit 1 at 2.]  Because Ms. Chandler did not have the consent of another Member to withdraw, the Withdrawal Letter was legally meaningless and ineffective.  At all relevant times, Ms. Chandler was, and continues to be, a Member of My K9 Behaves.  And because the attempt to withdraw was ineffectual, it also was not a valid revocation of Ms. Chandler's assignment of her intellectual property interests to My K9 Behaves, and therefore had

---

[6] During her testimony at the hearing, Ms. Chandler repeatedly disclaimed the idea that she knowingly or voluntarily transferred to My K9 Behaves any interests in her "life's work."  [*See, e.g.*, Filing No. 147 at 85 ("I never would have signed my life's work away, never.").]  She also cried at the sight of the certificates of registration showing the copyrights registered to My K9 Behaves.  Ms. Chandler's testimony on this issue is entirely implausible in light of Mr. Faber's testimony, which is supported by the emails sent and received by Ms. Chandler, as well as the reality that My K9 Behaves—which Ms. Chandler acknowledges was expressly created, among other reasons, to create a video derivative of her prior works—would not be able to operate absent such an assignment.  Moreover, she expressly confirmed her understanding of these matters in acknowledging that, had she completed the Book, it would have been owned by My K9 Behaves because My K9 Behaves owned the rights to the works upon which the Book is to be based.  [*See* Filing No. 147 at 118.]  In sum, much of Ms. Chandler's testimony about her understanding of the contents and effect of the Operating Agreement is incredible.

no effect on My K9 Behaves' ability to use, sell, and distribute such property.  The Court notes, however, that because Ms. Chandler did not effectively withdraw from the company, Mr. DeTrude and Mr. Zweigel were required under the Operating Agreement to obtain her consent in all decisions concerning company operations.  To the extent they failed to do so, they were in violation of the Operating Agreement.

### C.  Judicial Dissolution

#### 1.  Standards for Judicial Dissolution

Indiana Code § 23-18-9-2 provides as follows:

> On application by or for a member, the circuit or superior court of the county in which the limited liability company's principal office, or if there is none in Indiana, in which the registered office is located, may decree dissolution of the limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or operating agreement.

Indiana courts have yet to interpret this provision or provide any guidance about what circumstances might justify judicial dissolution of an LLC.  *See Thornton v. CMB Ent., LLC*, 309 F.R.D. 465, 470 (S.D. Ind. 2015) (recognizing that "Indiana courts have not yet explained exactly what circumstances render it 'impracticable' to carry on the business of an LLC").  In *Thornton*, this Court concluded that the plaintiff had stated a plausible claim for judicial dissolution under § 23-18-9-2 where the allegations, accepted as true, demonstrated that "the LLC has embarked on a course of action that will seriously endanger its prior successes," and "the decision to embark on this course of action has apparently driven a wedge between" the LLC's members.  309 F.R.D. at 469-70.  The Court concluded that these allegations supported the inference "that both the financial viability and managerial harmony of the LLC are in serious jeopardy," and therefore dissolution may be appropriate.  *Id.*  The *Thornton* Court, however, had no occasion to consider the merits of the judicial dissolution claim.

Other states have dissolution statutes similar to Indiana's, and courts in many of those states have considered the circumstances under which judicial dissolution may be warranted. Of particular relevance is Delaware, as Indiana courts have looked to Delaware courts for guidance on corporate law issues. *See, e.g.*, *In re ITT Derivative Litig.*, 932 N.E.2d 664, 668 (Ind. 2010) ("[W]e have looked to Delaware law when considering cases involving alleged breaches of fiduciary duties."). While Delaware law "provides no blueprint for determining whether it is 'not reasonably practicable' for an LLC to continue," courts in that state have recognized several relevant circumstances indicative of a lack of reasonable practicability, including: "(1) the members' vote is deadlocked at the Board level; (2) the operating agreement gives no means of navigating around the deadlock; and (3) due to the financial condition of the company, there is effectively no business to operate." *Seokoh, Inc. v. Lard-PT, LLC*, 2021 WL 1197593, at *8 (Del. Ch. Mar. 30, 2021) (footnotes omitted). "None of these factors is 'individually dispositive; nor must they all exist for a court to find it no longer reasonably practicable for a business to continue operating.'" *Id.* (footnote omitted).

In a similar vein, a Kentucky court surveying caselaw from a number of jurisdictions found the following factors relevant to the question of whether it was reasonably impracticable for an LLC to continue its operation, including: (1) whether the management of the entity is unable or unwilling reasonably to permit or promote the purposes for which the company was formed; (2) whether a member or manager has engaged in misconduct; (3) whether the members have clearly reached an inability to work with one another to pursue the company's goals; (4) whether there is deadlock between the members; (5) whether the operating agreement provides a means of navigating around any such deadlock; (6) whether, due to the company's financial position, there is still a business to operate; and (7) whether continuing the company is

financially feasible.  *Unbridled Holdings, LLC v. Carter*, 607 S.W.3d 188, 198 (Ky. Ct. App. 2020) (quoting *Gagne v. Gagne ("Gagne I")*, 338 P.3d 1152, 1159 (Colo. Ct. App. 2014)).  No single factor is dispositive, "[n]or must a court find that all of these factors have been established in order to conclude that it is no longer reasonably practicable for a business to continue operating." *Gagne I*, 338 P.3d at 1161 (citations omitted).

Underlying many of the decisions from other courts is the idea that judicial dissolution is an extreme measure that should not be undertaken lightly.  *See, e.g.*, *In re Arrow Inv. Advisors, LLC*, 2009 WL 1101682, at *2 (Del. Ch. Apr. 23, 2009) ("Given its extreme nature, judicial dissolution is a limited remedy that this court grants sparingly. . . .  [D]issolution is reserved for situations in which the LLC's management has become so dysfunctional or its business purpose so thwarted that it is no longer practicable to operate the business, such as in the case of a voting deadlock or where the defined purpose of the entity has become impossible to fulfill.") (footnotes omitted); *Gagne I*, 338 P.3d at 1160 (quoting *In re Arrow*); *In re 1545 Ocean Ave., LLC*, 72 A.D.3d 121, 131 (N.Y. Sup. Ct. 2010) (noting that "[d]issolution is a drastic remedy").

Disputes among members are not enough to warrant judicial intervention, and courts endeavor to bind parties to their operating agreements where possible.  *See In re Arrow*, 2009 WL 1101682, at *2 ("The court will not dissolve an LLC merely because the LLC has not experienced a smooth glide to profitability or because events have not turned out exactly as the LLC's owners originally envisioned; such events are, of course, common in the risk-laden process of birthing new entities in the hope that they will become mature, profitable ventures."); *Haley v. Talcott*, 864 A.2d 86, 96 (Del. Ch. 2004) ("When the agreement itself provides a fair opportunity for the dissenting member who disfavors the inertial status quo to exit and receive the fair market value of her interest, it is at least arguable that the limited liability company may

still proceed to operate practically under its contractual charter because the charter itself provides an equitable way to break the impasse.").

However, judicial dissolution does not require that the LLC be entirely deadlocked, that its purpose be completely frustrated, or that carrying on be utterly impossible. *See Seokoh*, 2021 WL 1197593, at *8 (noting that a petitioner seeking dissolution need not show that the purpose of the LLC has been "completely frustrated," and that "dissolution may be warranted even where an LLC is 'technically functioning' and 'financially stable' if the petitioner can demonstrate that the entity is otherwise stuck within a 'residual, inertial status quo' that prevents it from 'operating or from furthering its stated business purpose'"); *Unbridled Holdings*, 607 S.W.3d at 198 ("We reiterate that this standard does not require that the purpose of the company, as set out in the operating agreement, be completely frustrated or totally *impossible* to fulfill before the trial court can order judicial dissolution.  It allows for dissolution where the disagreement or conflict among the members regarding the means, methods, or finances of the company's operations is so fundamental and intractable as to make it unfeasible for the company to carry on its business as originally intended.") (emphasis original).

The Court finds all of this caselaw instructive.  Following the lead of the Delaware, Kentucky, and Colorado courts, the Court distills the following factors that will guide its analysis of whether judicial dissolution is warranted: (1) whether My K9 Behaves is deadlocked at the board level; (2) whether the Operating Agreement provides a means of navigating around the deadlock; (3) whether the Members are unable or reasonably unwilling to permit or promote the purposes for which My K9 Behaves was formed; (4) whether the Members have clearly reached an inability to work with one another to pursue My K9 Behaves' goals; (5) whether any Member has engaged in misconduct; (6) whether the financial condition of My K9 Behaves is such that

there is effectively no business to operate; and (7) whether it is financially feasible to continue the business.  The Court will consider each factor in turn.

### 2.   *Whether My K9 Behaves is Deadlocked*

The Operating Agreement provides that decisions concerning company operations must be made by majority rule and that Ms. Chandler must consent to any decision.  [Joint Exhibit 1 at 2.]  There is no way that Mr. DeTrude and Mr. Zweigel can properly make any significant decision without the support of Ms. Chandler, and Ms. Chandler cannot make any significant decision without the support of either Mr. DeTrude or Mr. Zweigel.  Given that Ms. Chandler has clearly expressed that she is not willing to participate in company decisions, and the antagonism expressed toward her by Mr. DeTrude and Mr. Zweigel, My K9 Behaves is deadlocked to the extent that no significant decisions can be made.  In other words, while My K9 Behaves can continue forward in a state of "residual, inertial status quo," *see Seokoh*, 2021 WL 1197593, at *8, nothing more, nothing less, and nothing different can ever be done.  That certainly constitutes the kind of deadlock contemplated by the judicial dissolution statute, and this factor weighs in favor of dissolution.

### 3.   *Whether the Operating Agreement Provides a Means of Navigating around the Deadlock*

The Operating Agreement says nothing about navigating around deadlock among Members.  It provides that decisions regarding "how to handle the possibility of a Member being incapacitated or otherwise unable or unwilling to participate in the Company in the manner contemplated by the Members" should be made "in as equitable a manner as possible" and "in a collaborative, transparent manner [that is] consistent with the provisions of paragraph 6," which in turn provides that decisions must be made by majority rule with Ms. Chandler being a part of any majority.  [Joint Exhibit 1 at 3.]  This language is merely aspirational provides no clear

21

guidance on how to handle a situation where, as here, competing factions of My K9 Behaves, each like a dog with a bone, refuse to concede any ground.  This factor weighs in favor of dissolution.

> ### 4.   Whether Members are Unable or Reasonably Unwilling to Promote the Purposes for Which My K9 Behaves was Formed

As stated in the Operating Agreement, the objective of My K9 Behaves is "to create a method and system of canine behavioral training, along with branded products and services, which is intended to be marketed and delivered through traditional and novel ways and channels."  [Joint Exhibit 1 at 1.].  My K9 Behaves has made and still sells the Video, but as noted above, cannot do anything else given the current deadlock among the Members.  In that sense, the Members are no longer able to work together in furtherance of the company's objective.[7]  This factor weighs in favor of dissolution.

> ### 5.   Whether the Members Have Clearly Reached an Inability to Work with One Another to Pursue My K9 Behaves' Goals

This factor needs little explanation.  The Members of My K9 Behaves no longer get along at all, and therefore cannot work together to pursue the company's goals.  This factor weighs in favor of dissolution.

> ### 6.   Whether Any Member Has Engaged in Misconduct

This factor similarly does not merit much discussion.  The Court finds that all parties to this action are unsympathetic and come with unclean hands.  Ms. Chandler likely lied on the stand and appears to take no accountability for her actions.  Mr. DeTrude has a history of making

---

[7] To the extent that this factor requires a finding that any Members' unwillingness to participate in Company operations is "reasonable," the Court notes, based on its experience with this litigation and interactions with the parties, that there is a universal lack of reasonableness.  In that sense, any alleged unreasonableness in Ms. Chandler's desire to leave My K9 Behaves is not particularly significant in the big-picture determination of whether My K9 Behaves should be judicially dissolved.

demands and belittling Ms. Chandler.  And as noted, Mr. Zweigel has demonstrated a penchant for instigating conflict and provoking emotional responses and was also untruthful at the hearing. Ms. Chandler disregarded the express terms of the Operating Agreement by attempting to withdraw without the support of another Member, and both Mr. DeTrude and Mr. Zweigel disregarded the express terms of the Operating Agreement by continuing to operate My K9 Behaves for their own benefit without the participation of Ms. Chandler.  With every Member in the doghouse, this factor weighs in favor of dissolution.

### 7. Whether the Financial Condition of My K9 Behaves is Such That There is Effectively No Business to Operate

Despite the obvious discord among Members and the resulting issues facing My K9 Behaves, the Court acknowledges that the continued sale of the Video remains a profitable endeavor.  Further, My K9 Behaves' ability to continue sales of the Video and collect the profits therefrom is largely unaffected by the deadlock.  In that sense, My K9 Behaves is in a financially stable state and the sale of the Video is a specific avenue of business that can continue to operate. Theoretically, this could go on indefinitely.  But, for the reasons discussed above, My K9 Behaves will not be able to expand its business.  So although there is a financially successful business to operate, that business is limited and does not encompass the business purposes initially intended for My K9 Behaves.  Given these competing facts, the Court concludes that this factor is neutral and does not weigh in favor of or against judicial dissolution.

### 8. Whether it is Financially Feasible to Continue My K9 Behaves' Business

As discussed above, My K9 Behaves' financial state is not currently in jeopardy, and theoretically the company could go on indefinitely profiting from the sale of the Video.  It would be financially feasible to carry on the business as it is currently operating.  This factor weighs against dissolution.

9. *Remedy*

On balance, the above factors weigh in favor of judicial dissolution of My K9 Behaves. Having concluded that dissolution is appropriate, the Court must consider how to effect the dissolution.

"Judicial dissolution is essentially a proceeding in equity." *Gagne v. Gagne ("Gagne II")*, 459 P.3d 686, 696 (Colo. Ct. App. 2019) (citing cases from North Carolina, Washington, Wisconsin, and Colorado). Under Indiana law, "[a]s a general proposition, the trial court has full discretion to fashion equitable remedies that are complete and fair to all parties involved." *Swami, Inc. v. Lee*, 841 N.E.2d 1173, 1178 (Ind. Ct. App. 2006). "Equity has power, where necessary, to pierce rigid statutory rules to prevent injustice," but "where substantial justice can be accomplished by following the law, and the parties' actions are clearly governed by rules of law, equity follows the law." *Id.* at 1178-79.

In considering how to properly effect dissolution of My K9 Behaves, the Court looks to the Operating Agreement as a guide. The agreement does not clearly dictate what should occur upon dissolution or address every issue relevant to dissolution, but there are several provisions that, along with the other evidence, help lead the Court to an equitable solution.

The Operating Agreement contains a provision ("the Assignment Back Provision") which states that, if My K9 Behaves is dissolved, "the Trademark and Copyrights will be assigned back to Donna Chandler." [Joint Exhibit 1 at 2.] As an initial matter, the Assignment Back Provision references only specific intellectual property that is defined in the Operating Agreement. As determined above, these definitions include one particular trademark and the copyrights on all of Ms. Chandler's published works on the subject of canine training techniques. Further, given that the Assignment Back Provision says that certain items will be *assigned back* to Ms. Chandler, it

follows that the provision was referencing only items that were already in existence at the time when the Operating Agreement was signed. Therefore, while the Assignment Back Provision dictates that Ms. Chandler should receive certain intellectual property, it does not expressly apply to derivative works such as the Video.

However, in addition to the Assignment Back Provision, the Operating Agreement states that "[i]n the event that the Company ceases to operate at any time, Members shall each receive the remaining assets of the Company according to the Payout Percentages after debts and liabilities of the Company are settled." [Joint Exhibit 1 at 2.] The only way to distribute the Video according to the Payout Percentages would be to sell the Video and distribute the proceeds. But forcing a sale of the Video to anyone other than Ms. Chandler is inconsistent with the spirit of the Operating Agreement, which expresses an intention to return Ms. Chandler's work back to her, and would also go against Ms. Chandler's reasonable desire to not give "her life's work" to others. Other circumstances further support the notion that Ms. Chandler should be awarded the Video in the dissolution. First, it is undisputed—and expressly acknowledged in the Operating Agreement—that Ms. Chandler is credentialed and experienced in the field of canine behavioral training and that no other Member brings such qualifications to the table. Ms. Chandler is the only person depicted in the Video and the only person qualified to engage with customers' follow-up questions and other post-purchase dog training issues. Second, Ms. Chandler wrote her first iteration of the *Good Dog!* book many years ago, and her subsequent undertakings, including the Video, build upon that work. Based on her predominant contribution, the Court finds that ownership of all of the intellectual property rights relating to Ms. Chandler's works—including the trademarks and copyrights to the *Good Dog!* book, the

Video, and all derivatives thereof—must be assigned to Ms. Chandler upon dissolution of My K9 Behaves.

But awarding the Video to Ms. Chandler will not come without cost, and it is not in the interest of equity to award one party a windfall.  As noted above, the Operating Agreement directs that the other Members are to receive their share of the value of My K9 Behaves' assets in the event that the company ceases to operate.  Furthermore, other provisions of the Operating Agreement demonstrate that, in forming My K9 Behaves, the Members intended to create a long-term arrangement and to protect their interests for a number of years.  For example, the Operating Agreement protects Members from removal without cause for the first five years of operation, provides five years' worth of payouts for Members removed without cause, and provides for payment to Members' heirs in the event of their death.  [*See* Joint Exhibit 1 at 3.] Nothing in the Operating Agreement permits Ms. Chandler to unilaterally withdraw from My K9 Behaves, and indeed the decision-making procedures prevented her from doing so.  These combined circumstances lead the Court to the conclusion that principles of equity dictate that Ms. Chandler be required to pay consideration for the other Members' interests in My K9 Behaves as the company is dissolved.  *Mizrahi v. Cohen*, 104 A.D.3d 917, 920 (N.Y. App. Div. 2013) ("[I]n certain circumstances, a buyout may be an appropriate equitable remedy upon the dissolution of an LLC.").

Borrowing from the provisions of the Operating Agreement that seek to protect the Members' interests for five years, the Court finds that the appropriate payout to be made to each of the C&C Parties is five years' worth of their respective earnings.  To that end, the Parties are **ORDERED** to provide a joint statement showing the net distributions made to each Member in calendar year 2021 by **February 25, 2022**.  If agreement cannot be reached, the parties must file

26

competing statements by that date. After determining the net distributions made to Mr. DeTrude and to Content & Commerce in calendar year 2021, the Court, in a separate order, will multiply the respective distributions by five to determine the total amount the Chandler Parties must pay to Mr. DeTrude and to Content & Commerce. The Chandler Parties will be permitted to pay the consideration in monthly installments, on the first day of each month following the distribution determination order, for 60 months, without interest, and with no prepayment penalty should they choose to pay the aggregate amount early.

While the above conclusions address My K9 Behaves' main assets and the areas of primary dispute among the parties, the Court acknowledges that other, less contentious matters will be involved in winding up My K9 Behaves' affairs. The funds currently in My K9 Behaves' bank accounts shall be used to settle any liabilities, and then distributed to the Members in accordance with the Payout Percentages established in the Operating Agreement. However, the Court will leave the parties to handle any other matters by mutual agreement. The Court requests that the parties confer, and call upon the Magistrate Judge if necessary, to settle My K9 Behaves' affairs in a manner consistent with this Order.

### D.  Injunctive Relief

In addition to an order directing the judicial dissolution of My K9 Behaves, the Chandler Parties seek a preliminary injunction prohibiting the C&C Parties from using Ms. Chandler's name, image, and likeness for commercial purposes. [*See* Filing No. 170 at 2.] Specifically, they seek injunctive relief as it relates to their claims for violations of the right of publicity under Indiana Code § 32-36-1-8 and misappropriation of name, image, and likeness under Indiana common law. [*See* Filing No. 170 at 13-21.] At the evidentiary hearing, counsel for the Chandler Parties confirmed that their claim for injunctive relief was based solely on the C&C

Parties' continued operation of My K9 Behaves.  [*See* Filing No. 163 at 44 (Mr. Stephen Plopper confirming that the Chandler Parties' claim regarding the use of Ms. Chandler's name, image, and likeness is based on Mr. DeTrude and Mr. Zweigel's operation of My K9 Behaves, and that neither Mr. DeTrude nor Mr. Zweigel has "individually utilized" Ms. Chandler's name, image, or likeness).]

The purpose of a preliminary injunction is to preserve the parties' positions until a trial on the merits can be held.  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The procedural posture of this case is unique in that the Court has accelerated the trial on the merits of the Chandler Parties' claim for judicial dissolution of My K9 Behaves and has ordered My K9 Behaves judicially dissolved as set forth above.  Accordingly, the Chandler Parties' request for a preliminary injunction either dissolving My K9 Behaves or restraining in any way the operation of My K9 Behaves is now moot.  Upon issuance of this Order, My K9 Behaves will be dissolved and will therefore cease to operate aside from the parties taking the necessary steps to effectuate all necessary transfers of assets and wind up My K9 Behaves' affairs.  Because the Chandler Parties' request for injunctive relief relates only to the operation of a now-dissolved entity, their Motion for Temporary Restraining Order and Preliminary Injunction, [51], is **DENIED AS MOOT**.

### IV.
#### CONCLUSION

This case has now been pending for almost a year and a half, resulting in a tsunami of nearly 200 filings, all the while the parties fighting like cats and dogs.  This Order resolves only one of the many pending claims, but it is the Court's hope that the findings made herein will motivate the parties to call off their dogs and to reach a mutually agreeable solution to the remaining matters at issue in this lawsuit.

For the reasons outlined above, the Court finds in favor of the Chandler Parties on their claim for judicial dissolution of My K9 Behaves and now **ORDERS** that:

- The entity My K9 Behaves, LLC is hereby **DISSOLVED**;

- Ownership of any and all trademark and copyright interests relating to Ms. Chandler's works on canine behavioral training—including but not limited to her published books, training manual, the Video, and any other derivative works—shall be transferred from My K9 Behaves to Ms. Chandler;

- The parties must file a joint statement showing the net distributions made to each Member in calendar year 2021 by **February 25, 2022**.  If agreement cannot be reached, competing statements must be filed by that date.  After the Court determines the consideration to be paid by the Chandler Parties to each of the C&C Parties as outlined herein, the Court will issue a separate order requiring the Chandler parties to pay the consideration in monthly installments, on the first day of each month following the distribution determination order, for 60 months, without interest, and with no prepayment penalty should they choose to pay the aggregate amount early;

- The parties shall confer and endeavor to wind-up the affairs of My K9 Behaves, including any actions not specifically addressed in this Order; and

- The Chandler Parties' Motion for Temporary Restraining Order and Preliminary Injunction, [51], is **DENIED AS MOOT**.

The Court requests that the Magistrate Judge confer with the parties regarding a mutually agreed plan for winding up My K9 Behaves as well as the possibility of disposing of the parties' remaining claims short of trial.

Date: 2/1/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**